UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JASON SMITH, | ) |
| | ) |
| Plaintiff, | ) 18 C 8075 |
| | ) |
| vs. | ) Judge Gary Feinerman |
| | ) |
| CITY OF CHICAGO, KARLO FLOWERS, and | ) |
| JAMES MURPHY-AGUILU, | ) |
| | ) |
| Defendants. | ) |

### MEMORANDUM OPINION AND ORDER

In this suit against the City of Chicago and City employees Karlo Flowers and James Murphy-Aguilu, Jason Smith alleges that the City violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., and the Illinois Civil Rights Act ("ICRA"), 740 ILCS 23/1 *et seq*., by retaliating against him for filing a charge with the Illinois Department of Human Rights ("IDHR"); that Flowers and Murphy-Aguilu defamed him under state law; and that the City must indemnify Flowers and Murphy-Aguilu. Doc. 227. The court previously dismissed under Civil Rule 12(b)(6) Smith's claims against the Office of the Chief Judge of the Circuit Court of Cook County ("OCJ") and several affiliated defendants; the American Federation of State, County and Municipal Employees Council 31 ("AFSCME") and several affiliated defendants; and City employees Brandon Crase and Sydney Roberts. Docs. 147-148, 283-284 (reported at 2019 WL 6327423 (N.D. Ill. Nov. 25, 2019), and 2021 WL 463235 (N.D. Ill. Feb. 9, 2021)). The court entered partial final judgment under Civil Rule 54(b) as to the dismissal of Smith's claims against the OCJ and AFSCME defendants, Doc. 285, and the Seventh Circuit affirmed, 2022 WL 205414 (7th Cir. Jan. 24, 2022). With discovery complete, the City, Flowers, and Murphy-Aguilu move for summary judgment. Doc. 307. The motion is granted.

**Background**

The court recites the facts as favorably to Smith as the record and Local Rule 56.1 permit. *See Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018). "To dispute an asserted fact, a party must cite specific evidentiary material that controverts the [other party's asserted] fact," and "[a]sserted facts may be deemed admitted if not controverted with specific citations to evidentiary material." N.D. Ill. L.R. 56.1(e)(3). In addition, "[a] response may not set forth any new facts, meaning facts that are not fairly responsive to the asserted fact to which the response is made." N.D. Ill. L.R. 56.1(e)(2). Many of Smith's Local Rule 56(b)(2) responses violate the local rule by purporting to contest Defendants' Local Rule 56.1(a)(2) asserted facts with additional, non-responsive facts or with responsive facts unsupported with citations to record evidence. Doc. 325 at ¶¶ 13, 18, 21-22, 25-29, 37-40, 42-43, 48, 52-54. The asserted facts in question therefore are deemed admitted. *See Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218 (7th Cir. 2015) ("When a responding party's statement fails to dispute the facts set forth in the moving party's statement in the manner dictated by [Local Rule 56.1], those facts are deemed admitted for purposes of the motion.") (quoting *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009)).

At this juncture, the court must assume the truth of the following facts, but does not vouch for them. *See Gates v. Bd. of Educ. of Chi.*, 916 F.3d 631, 633 (7th Cir. 2019).

A. **OCJ Employment**

Smith began working for OCJ as a Juvenile Probation Officer in April 2003. Doc. 325 at ¶ 9. Smith served as President of AFSCME Local 3477, in which capacity he filed grievances on behalf of Black probation officers alleging that OCJ engaged in discriminatory practices. Doc. 324 at ¶ 52. In 2016, Smith filed an unsuccessful grievance on his own behalf arising from OCJ's denial of his request for an adjusted work schedule, and he filed an IDHR charge against

2

OCJ regarding the same issue. *Id*. at ¶ 53; Doc. 325 at ¶ 58. Smith also participated in a race discrimination lawsuit against OCJ filed in July 2015. Doc. 323 at 9.

On January 23, 2018, Annette Moore, the Chief of Staff of the City of Chicago's Civilian Office of Police Accountability ("COPA"), offered Smith a position as a COPA Investigator. Doc. 325 at ¶ 10. Smith accepted the offer that evening. *Id*. at ¶ 11. On January 31, COPA sent Smith a letter requiring him to report for orientation on February 16 at 9:00 a.m. *Id*. at ¶ 12.

On February 8, some two weeks after he accepted the new position at COPA that was to start on February 16, Smith informed OCJ that he would be going on "educational leave" beginning on February 16. *Id*. at ¶ 13. On February 13, Smith received confirmation from Truman College that he could register for a Conversational Spanish class. Doc. 324 at ¶ 12. On February 15, Smith informed his OCJ supervisor about his new job at COPA. *Id*. at ¶¶ 2-4.

### B. COPA Employment

COPA conducts investigations into certain incidents involving Chicago police officers. Doc. 325 at ¶ 2. Smith began working for COPA as a probationary Investigator on February 16. *Id*. at ¶¶ 1, 14, 41. That day, he informed Moore that he was a part-time police officer for the City of Berwyn. *Id*. at ¶ 15. Moore told Smith that he had to immediately resign his position as a Berwyn police officer, as it posed a direct conflict with his COPA employment. *Ibid*. Smith also told Moore that he had initially taken an educational leave from OCJ and was not sure whether his COPA employment would be compatible with taking classes. Doc. 324 at ¶ 21. At 5:00 p.m., Smith received an email from Karlo Flowers, COPA's Director of Administrative Services, stating: "Per your conversation with Chief of Staff Anette C. Moore, in order to maintain your employment with COPA, you must immediately terminate your part-time employment as a suburban police officer." *Id*. at ¶ 17; Doc. 325 at ¶ 15.

3

After his conversation with Moore, Smith resigned from the Berwyn police department. Doc. 325 at ¶ 16. In addition, Smith drafted a resignation letter to OCJ's Human Resources Director, William Patterson, and mailed it the evening of February 16. *Id*. at ¶ 17; Doc. 324 at ¶ 6. Smith did not receive confirmation of his resignation from OCJ and did not participate in an exit interview. Doc. 325 at ¶ 17. (Smith disputes Defendants' factual assertion that he did not receive confirmation of his resignation, arguing that he "received confirmation about his resignation when he … received the termination of his benefits notice" from Cook County, but the exhibit to which he refers, Doc. 323-10, is unreadable. *Ibid*.) OCJ's Labor and Employment Relations Counsel, Katherine Verrant, testified—without contradiction from any evidence in the record—that she never received Smith's resignation letter. *Id*. at ¶ 18.

On February 22, Smith executed and returned COPA's Conflict of Interest and Recusal Statement, which states in relevant part:

1. I have read and understand the **CIVILIAN OFFICE OF POLICE ACCOUNTABILITY (COPA) Conflicts of Interest and Recusal Policy (Policy)**. Consistent with the Policy, I understand and agree that, as an employee of COPA, it is crucial that I avoid conflicts of interest (potential or actual) that could undermine the independence and objectivity of my work as an employee of COPA or the work of the agency.

    ***

3. I understand and acknowledge that I must *immediately* disclose to COPA's Ethics Officer, *in writing*:

    a) Any secondary employment (whether or not it relates to police matters or investigations) and any volunteer engagements that relate to police matters or investigations.

*Id*. at ¶ 19. On February 23, Smith received the COPA Employee Policy Handbook, which includes COPA's Conflict of Interest and Recusal policy, which states in pertinent part:

4

> The City's Ethics Ordinance prohibits City employees from engaging in actions that may create a conflict of interest between the personal and/or financial interests of the employee (or family) and that of the City.
>
> ***
>
> COPA employees must ensure that their involvement in outside activities or relationships does [] not undermine the independence or objectivity of their work or the work of the COPA. Outside activities and relationships, including … outside employment … that may interfere with this obligation must be disclosed to COPA's Ethics Officer.
>
> ***
>
> COPA employees are responsible for disclosing any actual or potential conflict of interest situation he or she is aware of to [his or her] supervisor and the Ethics Officer, each in writing … COPA employees must disclose in writing to the Ethics Officer using the Outside Employment Form (see Appendix 1.1.4A) (whether or not it relates to police matters or investigations) and any volunteer engagements that relate to police matters or investigations.

*Id*. at ¶ 20. The COPA Handbook also includes an Outside Employment policy, which defines "outside employment" as "[a]ny paid employment performed by an employee in addition to his or her employment with the City" and requires that such employment be reported to COPA. Doc. 324 at ¶ 26. Smith did not disclose in writing any secondary employment or conflicts of interest to COPA's Ethics Officer. Doc. 325 at ¶ 21.

### C. OCJ and COPA Terminations

In June 2018, OCJ learned that Smith may have held prohibited secondary employment while on educational leave from OCJ. *Id*. at ¶ 22. Verrant called Flowers to ask whether Smith was employed with COPA. *Ibid*. On June 7, Flowers sent Verrant a memo stating that Smith had been employed full-time with COPA since February 16. *Id*. at ¶ 23. The next day, OCJ sent Smith a letter terminating him for "engaging in gainful employment while on an authorized leave of absence." *Id*. at ¶ 24.

5

On June 8, Flowers asked Verrant for "a copy of any relevant information or charges that you would potentially file, so that we can determine if any action is warranted on our part." Doc. 309-3 at 1. On June 11, Verrant sent Flowers an email with four attachments: Smith's June 8 termination letter; Flowers' June 7 memo confirming Smith's employment with COPA; a photograph showing Smith at COPA's April 9 Academy Graduation; and an email chain between Smith and several OCJ employees, titled "Educational Leave," documenting and explaining his request for educational leave. Doc. 325 at ¶¶ 25, 27-28.

The "Educational Leave" email chain begins with a February 1 email from Smith to Avik Das, OCJ's Director of Probation and Court Services, requesting educational leave from the week of February 13 through August 13. *Id*. at ¶¶ 26, 29. On February 6, Das granted Smith's request and asked for information about which school Smith was planning to attend, which course he was planning to take, and how the course was "logically related" to his employment opportunities at OCJ. *Id*. at ¶¶ 29-30. On February 8, Smith responded to Das's email by stating that he "will be attending a college that is recognized" and would be taking a course "with an emphasis on language and law," but did not name the school or course. *Id*. at ¶ 31. Smith's email stated further:

> I believe there were attachments to the memo submitted to the Chief Judge and Laura Kelly and should be provided to the additional parties attached to this email. Therefore, I have attached the Jordanette Matthews letter whereby she believes the present and past administration have tried to destroy my reputation. The original email submitted to Alton Smith where Probation Officer Bradley was granted a ten hour work shift despite the fabricated information created and submitted to the Illinois Human Rights Commission and to the Office of the Chief Judge stating no probation officer has ever had a ten hour work shift and the directive submitted from the Office of the Chief Judge to remove the fabricated document inserted into my personnel file.

*Ibid*. When sending Flowers the "Educational Leave" email chain, Verrant did not include any of the attachments referred to in Smith's February 8 email. *Id*. at ¶¶ 26-31. Flowers avers, with

6

no contradiction from any record evidence, that he did not understand Smith's February 8 email to refer to any complaint or charge that Smith had filed and did not know what "fabricated information" Smith was referring to. *Id*. at ¶ 48.

Flowers informed COPA's Chief Administrator, Sydney Roberts, that OCJ had terminated Smith on June 7 for engaging in gainful employment while on a leave of absence; that Smith had previously been employed full-time as a Probation Officer for OCJ; that Smith began a leave of absence from OCJ on February 16, the same day that he began working for COPA; that Smith had not disclosed to COPA that he was on a leave of absence from OCJ; and that OCJ did not permit Smith to engage in gainful employment while on a leave of absence. *Id*. at ¶¶ 38-39. Based on that information, Roberts determined that Smith had violated COPA's Conflict of Interest and Outside Employment policies, as well as its core principles of honesty and integrity, by misleading OCJ and failing to disclose to COPA his ongoing outside employment and conflict of interest. *Id*. at ¶ 40. Roberts decided to terminate Smith, and Flowers drafted a termination letter. *Id*. at ¶¶ 37, 40. On June 22, Flowers met with Smith and told him that he was being terminated due to his secondary employment. *Id*. at ¶ 41. That day, Smith received a termination letter stating that his "employment as a Probationary At-Will employee with the City of Chicago, Department of Civilian Office of Police Accountability will be terminated effective today, June 22, 2018." *Ibid*.

At the time Flowers told Roberts about Smith's leave of absence and termination from OCJ, Flowers had no knowledge that Smith had filed any lawsuit, IDHR charge, Equal Employment Opportunity Commission ("EEOC") charge, or Illinois Human Rights Commission ("IHRC") complaint, or that he had engaged in any other protected activity. *Id*. at ¶ 42. Similarly, at the time Roberts decided to terminate Smith, she had no knowledge that he had filed

7

any lawsuit, IDHR charge, EEOC charge, or IHRC complaint against Cook County or OCJ, or that he had engaged in any other protected activity. *Id*. at ¶ 43. Roberts did not personally review any documents from OCJ. *Ibid*.

Tim Saffran, a machinist employed by the City of Chicago Department of Water Management, was suspended in January 2016 for fourteen days for failing to report as secondary employment his personal business servicing municipal emergency vehicles. Doc. 324 at ¶ 56. Saffran intentionally omitted his personal business on five secondary employment forms provided to the City from 2005 through 2014. *Ibid*. Saffran was a career service employee, not a probationary employee, and his suspension was issued by a Department of Water Management Deputy Commissioner. *Ibid*.

D. **TSA Communications**

After his termination from COPA, Smith applied for a position with the United States Transportation Security Administration ("TSA"). Doc. 325 at ¶ 50. On September 27, 2018, Smith executed a TSA Authorization for Release of Information form "authoriz[ing] the custodian of records and other sources of information pertaining to me to release such information upon request of TSA, regardless of any previous agreement to the contrary." *Ibid*. On November 21, a TSA Personnel Security Specialist emailed Smith's COPA supervisor, James Murphy-Aguilu, asking for the following information as part of TSA's "pre-employment background investigation": Smith's "dates of employment[;] position [and] type of separation (retirement, resignation, termination, lay off, etc.)[;] and if applicable, any derogatory circumstances surrounding his separation." *Id*. at ¶¶ 4, 51. The email also requested "any information in [Smith's] disciplinary file that may be relevant to his suitability," and advised that a copy of Smith's Authorization for Release of Information was attached. *Id*. at ¶ 51.

8

On November 27, Murphy-Aguilu responded by email to TSA. *Id*. at ¶ 52. As to Smith's dates of employment, Murphy-Aguilu wrote: "Please see human resources - Karlo Flower (Chief of Staff) Karlo.flowers@chicagocopa.org"; as to Smith's position and type of separation, he wrote: "Jason was an Investigator, he was my direct report, my understanding is he was terminated"; and as to "any derogatory circumstances surrounding his separation," he wrote: "My understanding is he had failed to disclose secondary employment however, please refer to Karlo Flowers if you need a more detailed description of the termination." *Ibid*. Murphy-Aguilu did not provide TSA with any other information about Smith, and Flowers did not communicate at all with TSA or provide it with any information about Smith. *Id*. at ¶¶ 53-54.

Murphy-Aguilu testified at his deposition that he responded to the TSA email "out of courtesy" to Smith and did not think that he "had any duty to provide any information." *Id*. at ¶ 55. Murphy-Aguilu was aware that Smith had been involved with AFSCME when he worked for OCJ, but he never conveyed that information to Flowers or Roberts. Doc. 330 at ¶ 41. Murphy-Aguilu did not know whether Smith in fact had secondary employment, but he had been told that Smith was terminated for having secondary employment. Doc. 324 at ¶ 40. Murphy-Aguilu further testified that he believed that his response to TSA was true and accurate, that he had no reason to doubt its veracity, and that it was "extremely what [he] believed." Doc. 330 at ¶ 40; Doc. 330-1 at 9. No evidence in the record undermines in any way Murphy-Aguilu's testimony in these respects.

On January 30, 2019, TSA sent Smith a letter informing him that he was "ineligible" to work for TSA because his termination from COPA "involved intentionally doing something

9

wrong in the employer's estimation and, indicates your engaged misconduct or negligence may not promote the efficiency or protect the integrity of the service." Doc. 324 at ¶ 45.

## Discussion

As noted, Smith brings retaliation claims against the City under Title VII and ICRA, state law defamation claims against Flowers and Murphy-Aguilu, and an indemnification claim against the City.

### I.  Title VII and ICRA Retaliation Claims

Title VII's antiretaliation provision "prohibits retaliation against employees who engage in statutorily protected activity by opposing an unlawful employment practice or participating in the investigation of one." *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016) (citing 42 U.S.C. § 2000e-3(a)). As Smith and the City acknowledge, Doc. 308 at 17-18; Doc. 323 at 25, the standards governing Smith's ICRA claim are the same as those governing his Title VII claim. *See Cary v. Ne. Ill. Reg'l Commuter R.R. Corp.*, 2020 WL 1330654, at *5 (N.D. Ill. Mar. 22, 2020) (recognizing that ICRA and Title VII retaliation claims are governed by the same standards). "To establish a … retaliation [claim] under Title VII, [Smith] must show: (1) he engaged in a statutorily protected activity, (2) his employer took a materially adverse action against him, and (3) there is a causal link between the protected activity and the adverse action." *Mollet v. City of Greenfield*, 926 F.3d 894, 896 (7th Cir. 2019).

The City does not dispute the first two elements of Smith's claims, as he filed an IDHR charge against OCJ in July 2016, and the City terminated him in June 2018. Doc. 308 at 14. The City instead focuses on the causation element. Under the framework set forth in *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016), a Title VII claim survives summary judgment if the plaintiff presents evidence that, "considered as a whole," would allow a reasonable jury to find that his protected activity caused his termination. *Id*. at 765. To meet this burden, the

10

plaintiff may rely on the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), *see Ortiz*, 834 F.3d at 765-66, but that framework is just one way that the record can allow a reasonable jury to find retaliation, *see Volling v. Kurtz Paramed. Servs., Inc.*, 840 F.3d 378, 383 (7th Cir. 2016) (noting that *McDonnell Douglas* provides "a common, but not exclusive, method of establishing a triable issue of intentional discrimination") (internal quotation marks omitted). The court therefore must not limit its analysis to *McDonnell Douglas* or treat some evidence as relevant to the *McDonnell Douglas* analysis but not to the broader question whether, in its entirety, "the evidence would permit a reasonable factfinder to conclude that … [a] proscribed factor caused the … adverse employment action." *Ortiz*, 834 F.3d at 765; *see also Terry v. Gary Cmty. Sch. Corp.*, 910 F.3d 1000, 1004-05 (7th Cir. 2018) ("Although the oft-cited burden shifting framework from [*McDonnell Douglas*] provides a means of organizing, presenting, and assessing circumstantial evidence, we must consider the evidence as a whole in deciding whether to grant summary judgment.") (citations and internal quotation marks omitted).

Because the parties present their arguments under *McDonnell Douglas*, the court will "begin [its] assessment of the evidence by employing [the *McDonnell Douglas*] construct and address[ ] first whether [Smith] has established" a genuine dispute under that framework. *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). If Smith fails to do so, the court will then "assess cumulatively all the evidence" on which he relies "to determine whether it permits a reasonable factfinder to determine" that he was terminated because of his protected activity. *Ibid*.

The *McDonnell Douglas* framework allows Smith to forestall summary judgment if he adduces evidence showing that he (1) engaged in protected activity, (2) met his employer's

11

legitimate expectations, (3) suffered an adverse employment action, and (4) was similarly situated to at least one other employee who did not engage in protected activity and who was treated better—together, his *prima facie* case—provided that the City fails to articulate a reasonable alternative explanation for his adverse treatment or he shows that the proffered alternative explanation is a pretext for discriminatory animus. *See id*. at 225. Smith fails to establish his *prima facie* case under *McDonnell Douglas* because he identifies no similarly situated employee who did not engage in protected activity and was treated better than he was.

 Smith argues that Saffran is similarly situated because "they both worked for the City of Chicago" and were both found by the City to have failed to report secondary employment. Doc. 323 at 21-22. Although similarly situated employees "need not be identical in every conceivable way … the distinctions between the plaintiff and the proposed comparators [can]not [be] so significant that they render the comparison effectively useless." *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) (internal quotation marks omitted). That is because the "purpose [of the 'similarly situated' prong] is to eliminate other possible explanatory variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable—discriminatory animus." *Ibid*. (internal quotation marks omitted). "In the usual case a plaintiff must at least show that the comparators (1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id*. at 847 (internal quotation marks omitted); *see also McDaniel v. Progress Rail Locomotive, Inc*., 940 F.3d 360, 369 (7th Cir. 2019) (same); *Johnson*, 892 F.3d at 895 (same).

As a career service machinist employed by the Department of Water Management, Saffran did not deal with the same supervisors as Smith, was not subject to COPA's outside employment or conflict of interest policies, and, unlike Smith, was a non-probationary employee. Doc. 324 at ¶ 56; Doc. 325 at ¶ 41. Those significant differences preclude finding that Saffran was similarly situated to Smith, as they comprise multiple "other possible explanatory variables" for the fact that Saffran received only fourteen days of suspension for failing to report secondary employment while Smith was terminated for similar conduct. *Coleman*, 667 F.3d at 846; *see also Steinhauer v. DeGolier*, 359 F.3d 481, 484-85 (7th Cir. 2004) (holding that two employees were "not similarly situated because [one] was still on probation while [the other] was not"). As Saffran is not similarly situated to Smith, and Smith does not identify any other potential comparator, Smith cannot forestall summary judgment under *McDonnell Douglas*.

Smith's claims fare no better when examined through the lens of the broader question whether retaliation caused the City to fire him. No evidence in the record suggests that Smith's protected activity played any role in the City's decision. To the contrary, Flowers and Roberts—the individuals at COPA who decided to terminate Smith—aver, without contradiction from any record evidence, that they did not know that Smith had filed any grievance, IDHR charge, or lawsuit against Cook County or OCJ. Doc. 325 at ¶¶ 42-43. Without knowledge of Smith's protected activities, the City cannot have fired him in retaliation for engaging in them. *See Tomanovich v. City of Indianapolis*, 457 F.3d 656, 669 (7th Cir. 2006) ("[I]f an employer did not know the plaintiff made any complaints, it cannot be trying to penalize him for making them.") (internal quotation marks omitted).

Smith retorts that Flowers "had to understand" from Smith's February 8 email—which Verrant had sent Flowers—that he had filed an IDHR charge against OCJ alleging

13

discrimination. Doc. 323 at 13, 17. Specifically, Smith submits that this portion of his February 8 email indicated that he had filed an IDHR charge:

> I have attached the Jordanette Matthews letter whereby she believes the present and past administration have tried to destroy my reputation. The original email submitted to Alton Smith where Probation Officer Bradley was granted a ten hour work shift despite the fabricated information created and submitted to the Illinois Human Rights Commission and to the Office of the Chief Judge stating no probation officer has ever had a ten hour work shift and the directive submitted from the Office of the Chief Judge to remove the fabricated document inserted into my personnel file.

Doc. 325 at ¶ 31; Doc. 323 at 17. The email references "fabricated information created and submitted to the Illinois Human Rights Commission," but the fact that Smith described the information as "fabricated" conveys that someone *else* submitted materials to the IHRC, not that Smith himself did so. Drawing all reasonable inferences in Smith's favor, the email's references to the "past administration … destroy[ing] my reputation" and to a "fabricated document" having been inserted into his personnel file suggest only that Smith believed that OCJ had treated him unfairly in some way. Nothing in the email would allow a reasonable jury to find that Flowers knew from reading it that Smith had filed an administrative charge against OCJ.

Smith also argues that Murphy-Aguilu's knowledge that he had been involved with AFSCME during his time at OCJ can be imputed to Flowers. Doc. 323 at 17-18. But Smith points to no evidence supporting that theory, and Murphy-Aguilu testified—again, without contradiction from any record evidence—that he never told Flowers or Roberts about Smith's involvement with AFSCME. Doc. 330 at ¶ 41. Without supporting evidence, Smith's mere speculation that Flowers could have learned about his union activity from Murphy-Aguilu fails to present a genuine dispute as to whether Flowers in fact was aware of his union activity. *See Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 936 (7th Cir. 2021) ("[A] party must

14

present more than mere speculation or conjecture to defeat a summary judgment motion.") (internal quotation marks omitted).

Because no reasonable jury could find that Smith was terminated because of his protected activity, the City is granted summary judgment on his Title VII and ICRA retaliation claims.

**II.  Defamation**

As noted, Smith brings defamation claims against Flowers and Murphy-Aguilu based on what they told TSA. Doc. 323 at 13-15. To state a defamation claim under Illinois law, a plaintiff must show that: (1) "the defendant made a false statement about the plaintiff"; (2) "the defendant made an unprivileged publication of that statement to a third party"; and (3) "this publication caused damages." *Green v. Rogers*, 917 N.E.2d 450, 459 (Ill. 2009).

The undisputed facts show that Flowers did not communicate or provide any information about Smith to TSA. Doc. 325 at ¶ 54. It follows that Flowers could not have "made a false statement about [Smith]" to TSA, and Flowers is accordingly granted summary judgment on the defamation claim against him.

Murphy-Aguilu argues that his communications with TSA about Smith are protected by a qualified defamation privilege. Doc. 308 at 20-21. Illinois has adopted the Restatement (Second) of Torts, which recognizes three classes of "conditionally privileged occasions": "(1) situations in which some interest of the person who publishes the defamatory matter is involved[;] (2) situations in which some interest of the person to whom the matter is published or of some other third person is involved[; and] (3) situations in which a recognized interest of the public is concerned." *Kuwik v. Starmark Star Mktg. & Admin., Inc.*, 619 N.E.2d 129, 134-35 (Ill. 1993) (internal quotation marks omitted). A privilege exists under the second category for "an employer's statements in response to a prospective employer['s]" inquiries. *Quinn v. Jewel Food Stores, Inc.*, 658 N.E.2d 1225, 1234 (Ill. App. 1995) (holding that a former employer's

statements to prospective franchisors were conditionally privileged); *see also Roemer v. Zurich Ins. Co.*, 323 N.E.2d 582, 587 (Ill. App. 1975) (holding that a former employer's statements to a placement agency "must necessarily be classified as conditionally privileged"). The basis for the privilege is that the prospective employer "ha[s] an interest in the [former employer's] evaluation as a factor to determine [the] plaintiff's capabilities." *Quinn*, 658 N.E.2d at 1234.

Murphy-Aguilu's statements to TSA about Smith are conditionally privileged, as they were made in response to inquiries from Smith's prospective employer. *See ibid.*; *Roemer*, 323 N.E.2d at 587. Smith applied for a job with TSA, prompting a TSA Personnel Security Specialist to seek information from Murphy-Aguilu about Smith's employment at COPA—specifically, Smith's dates of employment, position, type of separation, and "any derogatory circumstances surrounding his separation"—as part of TSA's "pre-employment background investigation." Doc. 325 at ¶¶ 50-51. In response, Murphy-Aguilu told TSA that Smith had been an Investigator, that he had been Murphy-Aguilu's direct report, that he had been terminated, and that he had failed to disclose secondary employment. *Id*. at ¶¶ 51-52. Those statements were the extent of what Murphy-Aguilu told TSA about Smith. *Id*. at ¶ 53. And because they were made "in response to a prospective employer['s]" inquiries, they are protected by the qualified privilege. *Quinn*, 658 N.E.2d at 1234.

"The qualified privilege serves to enhance a defamation plaintiff's burden of proof." *Kuwik*, 619 N.E.2d at 133. "[O]nce a defendant establishes a qualified privilege, a plaintiff must prove that the defendant either intentionally published the material while knowing the matter was false, or displayed a reckless disregard as to the matter's falseness. Reckless disregard as to the matter's falseness has been defined in Illinois as publishing the defamatory matter despite a high degree of awareness of probable falsity or entertaining serious doubts as to its truth." *Ibid*.

16

(internal quotation marks and citations omitted). While "the issue of whether a qualified privilege exists [is] a question of law for the court, [] the issue of whether the privilege was abused [is] a question of fact." *Ibid*.

The record indisputably shows that Murphy-Aguilu believed that his statements to TSA were true and that he did not know of any reason to doubt their veracity, Doc. 330 at ¶ 40; Doc. 330-1 at 9, and that COPA in fact terminated Smith because it sincerely believed, based on information provided by OCJ, that he had been employed at OCJ while working for COPA, Doc. 325 at ¶¶ 37-40. By contrast, no record evidence suggests that Murphy-Aguilu believed (or had any reason to believe) that Smith had *not* failed to disclose secondary employment to COPA. It follows that no reasonable jury could find that Murphy-Aguilu's statements to TSA were made either "intentionally … while knowing the matter was false" or "despite a high degree of awareness of probable falsity or entertaining serious doubts as to its truth." *Kuwik*, 619 N.E.2d at 133. Accordingly, given the protections afforded by the qualified privilege, Murphy-Aguilu is granted summary judgment on Smith's defamation claim.

**III. Indemnification**

Smith seeks indemnification against the City based on its liability, under a *respondeat superior* theory, for Flowers's and Murphy-Aguilu's alleged defamation. In Illinois, local government liability is governed by the Local Governmental and Governmental Employees Tort Immunity Act, 745 ILCS 10/1 *et seq*. Relevant here, the Act states that "[a] local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable." 745 ILCS 10/2-109. Because Flowers and Murphy-Aguilu are not liable for defamation, Smith's indemnification claim against the City necessarily fails.

**Conclusion**

Defendants' summary judgment motion is granted. Judgment will be entered in favor of the City, Flowers, and Murphy-Aguilu, and against Smith.

March 30, 2022

                                                United States District Judge